MILO THOMAS, RESPONDENT, v. METROPOLITAN LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—89 S. W. (2d) 590.

Kansas City Court of Appeals. November 12, 1935.

*E. M. Jayne, John Campbell* and *A. D. Campbell* for respondent.

*Murrell & Murrell, Meservey, Michaels, Blackmar, Newkirk & Eager, Robert E. Coleberd* and *LeRoy A. Lincoln* for appellant.

TRIMBLE, J.—Plaintiff, as the holder of a policy of life insurance issued by the defendant, to which policy was attached a "rider" or supplemental contract, brought suit thereon, alleging that the insurance company had therein agreed to pay insured the sum of $10 per month "during such period of time as he should be disabled as the result of bodily injury occurring and originating after the issuance of said policy, such payments to continue at said rate of payment during the continuance of such disability."

The petition, filed April 19, 1934, alleged that on September 7, 1932, he accidentally received an injury while working as a hired man of the Adair Lumber Company and performing his duties as such employee, by running a wooden splinter into the flesh and against the bone of the second finger of his right hand, from which infection ensued, and since said time he has been, and now is, unable to perform his duties as such hired man; that there had accrued and was due to him on April 7, 1934, the sum of $190, being $10 per month during the continuance of said disability up to said April 7, 1934; that defendant wilfully and vexatiously refused to pay same, by reason of which plaintiff has been forced to employ attorneys to prosecute this action, a reasonable fee for which is $125. The petition further alleged that said "rider" or provision further agreed that, during the continuance of disability, the company would waive the payment of premiums on said policy but, nevertheless, defendant refused to waive said premiums, and on January 14, 1933, collected $33.34, the amount which otherwise would have been due had insured had been disabled as set forth.

Wherefore, judgment was prayed for said $190 with ten per cent interest as damages for vexatious refusal to pay, and for $33.34, the amount of premiums so collected as stated above and said attorneys' fee of $125.

The answer, while denying in formal terms that it issued the contract of insurance alleged and described, nevertheless alleged that it issued a policy in the amount and of the specific number alleged in the petition, and asserted that by a supplementary agreement, or rider, attached thereto, it agreed that if insured became "totally and permanently disabled as the result of bodily injury or disease occurring and originating after the issuance of said policy, so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit, and that such disability had already continued uninterruptedly for a period of at least three months, it would, during the continuance of such disability, waive the payment of each premium falling due, and pay to the insured, . . . a monthly income of $10, provided further

that such premium waiver should begin as of the anniversary of such policy next succeeding the date of the commencement of such disability; . . . that if the insured should be able to perform any work or engage in any business whatsoever for compensation or profit the monthly income therein provided should immediately cease and all premiums thereafter falling due should be payable according to the terms of said policy and of said supplementary contract.

The answer then denied that the plaintiff "has been or is, totally and permanently disabled so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit" and stated that he has not been and is not so disabled; and denied that plaintiff was or has been or is disabled to the extent and degree required and defined in and by the terms of the aforesaid supplementary contract.

Without regard to whether a reply should have been filed to the answer, no reply was in fact filed, but the case was tried as if one was filed.

On September 4, 1934, said trial was had, and the jury returned a verdict for plaintiff in the sum of $190 for the disability claimed up to April 7, 1934, for $66.68 due for return of premiums wrongfully collected, for $19 damages for vexatious delay, and $125 attorneys' fee, making a total of $400.68, for which judgment was rendered, and defendant has appealed.

The evidence in plaintiff's behalf is that on the seventh day of September, 1932, he was working for the Adair Lumber Company, in Kirksville, Missouri, engaged in piling lumber; and in slipping a six-by-six-inch lumber about ten feet long, into its place on the pile, a splinter was run into the middle finger of his right hand. In a few days thereafter it was badly swollen and his hand became infected and swelled so that his fingers stood out from each other and the arm swelled to his shoulder. The doctor lanced it a number of times, and plaintiff was bedfast from September 20th until sometime in January. His finger and hand have been stiff ever since. Plaintiff has been unable to work although he tried for a day and a half to do so, but he was compelled to quit because he couldn't shut his hand or grasp a tool with his right hand and has never been so able since the accident and is still so disabled. He has not engaged in any occupation or business since that time.

His physician's certificate stated that he might do some work with his left hand; that his total disability will probably be temporary, and that later his ailment can be successfully treated while continuing at work either for full or part time, and that he cannot use his right hand for probably four to six weeks.

On January 23, 1933, defendant wrote a letter to plaintiff saying, among other things, "inasmuch as it appears that your disability

is confined to one hand, and there is no reason to assume that such a condition should permanently totally incapacitate you, we regret our inability to be of service. The medical opinion is that you will not be totally permanently incapacitated. Your policy provides benefits only when a complete incapacity to perform any and all kinds of work is shown to be permanent, and it makes no provision for disabilities of a partial or temporary nature.''

The company then advised the continuation of premium payments with the understanding that if at any later date he should become disabled to the extent ''that you are not only wholly unable to perform all work but will be so disabled permanently,'' the company would be glad to consider the matter on request.

Plaintiff's evidence further revealed that in 1933, exact dates not shown, he worked for the city of Kirksville for a day and a half and was paid for it; that he worked out in the cemetery raking leaves and grass for a day and a half, but did not do any other work except in his own garden where he hoed a few weeks; he did a little work in 1934, mixing mortar in a mortar box with a hoe, using sand and plaster which comes in sacks, shoveling the same into the box and carrying the mixed mortar in a bucket to where it was being used. He was not regularly in the employ of anyone, but worked a few days now and then for one, Novinger, the latter part of June, 1934. He also worked ''a couple of hours last Saturday'' (presumably in August or September, 1934) and then ''kinda cleaned up some'' where Novinger had been plastering; his cleaning up was done by ''picking up stuff off the yard;'' he also carried and piled brick, and worked, and was paid for it, for others, and did possibly a dozen little jobs using a rake, a hoe and shovel.

An osteopath physician said that the last time he dressed and treated plaintiff's hand was about January 11, 1934, that in addition to the injured finger his shoulder was made somewhat stiff by reason of infection settling around the joint, so that he was, for a time, unable to get his arm up to his head; but, under treatment, it got better, especially after he, the physician, found a piece of the splinter remaining next to the bone and removed it, whereupon the swelling and stiffness went out, and plaintiff ceased complaining of pain. The doctor last saw the hand in May, 1934. The finger was stiff and in the opinion of the doctor would always be stiff, but the rest of the hand was in ''pretty good shape;'' plaintiff was able to work and do any kind of work that is not interfered with by a finger that is stiff and sticks out straight. The doctor's opinion was that plaintiff would never be able to use his hand like he did before it was injured, but he will be able to use it some, he is not totally disabled permanently.

A physician, Dr. Sneed, who was a witness for defendant, and testified he treated plaintiff for his finger from about September 21,

1932, up to April 12, 1933, said plaintiff's finger was swollen to four or five times the size of a normal finger and plaintiff was running considerable fever and "suffering like everything," and who "looked after him" for several months, said that on the last date he examined him he was totally disabled at that time. Dr. Huls, another doctor, who testified as a witness for plaintiff, said he was first called to treat him on April 14, 1933, and continued to do so up to January 11, 1934, and had occasion to examine his hand and shoulder as late as May, 1934, said that he was totally and permanently disabled. There was in fact no evidence to the contrary.

"Totally and permanently," as the word is used in the policy, does not mean that a man must be so wholly incapacitated as not to be able to move or do anything at all. Nor does it mean that his inability to work must continue throughout life.

The terms of the supplemental contract, or rider, show that the word "totally" does not mean an entire absence of physical strength or ability, else why should the contract contain the words "so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit." Merely because plaintiff tried to work for a day or two, but was unable to continue, does not prove that he was not "totally" disabled. And if "permanently" was intended to mean forever thereafter during insured's life, why use the words "during the continuance of such disability?" And if the disability is to be "permanent" in the meaning as claimed by defendant, why did the policy provide that the indemnity, instead of being for one entire lump sum, should be a *monthly* benefit or income of $10 and why demand of plaintiff at any time required "due proof of the continuance of such disability?"

The supplementary contract, or rider, in the case at bar, is wholly unlike the one in the case of Paul v. Missouri State Life Ins. Co., 52 S. W. (2d) 437. The nature of the disability and the length of time it was to endure in that case is plainly set forth in pages 439 and 442. If any one portion, or clause, or paragraph, of the policy in suit can be construed as meaning that the disability referred to generally in the contract means what defendant claims it means, then such language should be, as stated in the Paul case, 52 S. W. (2d) 439, regarded "as creating an ambiguity, which under the law, must be construed in favor of the insured, and to show the intention to pay for disability other than one lasting for life." The penalty for vexatious refusal and delay was properly submitted. The letters written by appellant refusing to pay, gave an arbitrary and false basis therefor, and, in order to state an apparent reason, misconstrued the terms and effect of the attached rider or supplementary contract sued on. Hence a recovery for vexatious delay was proper (Porter v. Equitable Life Ins. Society of United States, 71 S. W. (2d) 766, 778 and 779) ; and the court did not err in sub-

mitting the issue of penalties and attorneys' fees to the jury, because of any lack of evidence to support the same.

The contentions that instruction number 1 authorized a recovery in excess of the amount prayed in the petition, and that the verdict is excessive because it is greater than the amount asked in the petition, cannot be upheld. We have repeatedly searched the record, but can find nothing to justify such a claim, as the amounts of the verdict correspond to those stated in the petition.

In the course of the *printed argument* defendant attempts to raise a point not raised or mentioned in the points and authorities. We cannot consider or decide a matter so sought to be raised in the printed argument. *for the first time.*

Wherefore, finding no reversible error in the case, the judgment must be affirmed. It is so ordered. All concur.